14. On January 24, 2006, Defendants submitted their "final" design for the home's lighting system. To that point, Defendants had charged Mr. Siegal over $470,000 in "design and consultation fees." Defendants had further charged Mr. Siegal over $110,000 in "reimburseables," primarily travel time and travel expenses for Mr. White's trips to the Bahamas to coordinate design and oversee initial construction. In sum, Mr. Siegal had paid almost $600,000 simply for Defendants to design the "perfect" lighting system.

15. Aside from a few minor open items, Mr. White represented that the January 2006 design was complete, and all that remained was to execute it.

16. However, when installation of the lighting system began, it quickly became obvious that Defendants' design was massively flawed.

Wiring and Lutron System Design Flaws

17. As Lutron itself later determined, one of the most significant – and dangerous – flaws involved the design's failure to specify proper wiring for the lighting system. Not only did Defendants' design fail to specify properly the appropriate communication wire, it failed to ensure proper cable routing and termination, greatly increasing the chances of interference and breakdowns. Defendants' design also improperly balanced the electrical loads on the system, resulting in outages, short circuits, and lights that simply would not turn on. Electricians on the job claimed that they were afraid to turn on the lights for fear that the electrical system would explode.

18. Despite Defendants' promise that their system design complied with a variety of electrical codes, numerous aspects of the system presented blatant code violations, including:

   a. bundling line voltage wiring and low-voltage wiring;
   b. failing to ground numerous wires; and

    c. crossing wires, resulting in electrical shorts.

19. Mr. White's ignorance of the crucial issue of proper wiring – a purported expertise for which Mr. Siegal had paid hundreds of thousands of dollars – is well-illustrated by an e-mail Mr. White sent to a Lutron representative. In that e-mail, the Lutron representative asks Mr. White how much "2 conductor low voltage (class 2) wire" they would need for specific fixtures. Mr. White failed to recognize that the identified wire could not be used for these fixtures, which required a completely different type of wire. He then wrote the Lutron representative, "My assumption is that your guess is going to be far more accurate than mine. How's that for avoiding any responsibility?"

20. The wiring design issues revealed themselves in spectacular fashion in late 2006. When the Lutron system was turned on for the first time, it immediately shorted out, damaging a number of system components that had to be replaced.

Additional Design Flaws

21. Significant design flaws also vitiated a major purpose of hiring a professional lighting designer – to ensure that Mrs. Siegal could see in her own home. Specifically:

    a. In a dark hallway almost one hundred yards long, Defendants designed and installed tiny recessed lights. Mrs. Siegal cannot see sufficiently in this hallway to navigate it by herself.

    b. Similarly, the lighting in the media room is so low that neither Mr. Siegal nor Mrs. Siegal can read in the room, and there is no way to sufficiently brighten the lights

22. Defendants committed other unprofessional and negligent design errors or omissions that belied their purported expertise:

    a. Certain lighting fixtures cannot be operated manually, but are solely controlled by computer, meaning that a software engineer is required in order to make any adjustments to the lights.

    b. Defendants' design had hidden the light switch for an indoor-outdoor terrace thirty feet away inside a dark laundry room.

    c. The ceiling fans that Defendants had designed and installed on the indoor/outdoor terrace were insufficient to move the air in the room, requiring entirely new units to be purchased and installed.

    d. Insufficient lighting was installed for the tennis courts, leaving them unplayable in the evening or at night.

    e. Eleven custom-designed and built light-diffusing fixtures, costing over $325,000, began shedding glass panels shortly after installation. The falling panels not only ruined the appearance of the fixtures, but posed a grave danger to anyone standing beneath them. Unwilling to redesign and reinstall the fixtures, Defendants instead re-tied glass panels to the frames using transparent fishing line.

<u>Defendants' Attempted Fixes</u>

23. When it became apparent that Defendants' designs were severely flawed, Mr. Siegal demanded that the problems be addressed. Defendants proved just as incapable of fixing their mess as they had been in the initial task of design and supervision.

24. Throughout the summer and fall of 2006, Defendants traveled to the Bahamas in an attempt to get their lighting system to operate properly. In each case, they were unsuccessful. Lights were not operable from different rooms, computer-controlled window shades did not

function, lights did not turn on automatically at their assigned time, and the system remained in continual danger of crashing or shorting out due to the faulty wiring.

25. Throughout this period, Defendants continued to bill Mr. Siegal for work that amounted to simply trying to fix their own mistakes. As Defendants continued to fail, their bills continued to mount. "Design and consultation fees" alone were billed at $17,000 for May, $21,000 for June, $30,000 for July, $17,000 for August, $23,000 for September, $37,000 for October, and $43,000 for November. Similarly, Defendants traveled to the Bahamas – at Mr. Siegal's expense – to try and rectify the lighting system's flaws. Nothing worked.

26. On one occasion, White Lighting employee Elizabeth Gillmor was flown to the Bahamas at Plaintiff's expense for the express purpose of re-programming the system. Instead, she succeeded in crashing the entire system, and left it inoperable.

27. In November and early December 2006, Defendants made a "final push" to get the home ready for the holidays. The entire Siegal family, including a number of small grandchildren, was coming to the Bahamas for the holidays. Mr. White brought a team of employees, as well as an outside electrical engineer, to the Bahamas in yet another attempt to fix Defendants' mistakes.

28. In mid-December 2006, Mr. White declared the lighting complete. He claimed that all of the lights worked perfectly, the Lutron computer-control system was fully operational, and the home was in move-in condition. Once again, he was wrong.

29. On December 14, 2006 an independent electrical engineer ran the Lutron diagnostic test on the Lutron system that Mr. White had declared fully operational. The diagnostic test revealed 116 "serious" errors in the system. Entire rooms had no operational lights. Individual lights and switches did not work. Dimmers did not function. Certain lights

were not tied to the Lutron system at all. Other switches controlled multiple lights. The complex system that Mr. White had foisted on the Siegals despite their reluctance simply did not work.

30. But Defendants' failures were not limited to the Lutron system. Despite Mr. White's assurances that the lighting was "complete," and the house in "move-in condition," a review of the premises revealed numerous lighting and electrical flaws. In at least a dozen places, bare and live wires were left exposed. A number of electrical outlets and light switches were missing. Cover plates had not been installed. In three different locations, uncovered and ungrounded wire protruded from junction boxes. And there was no operational lighting at all for the tennis courts or the beach. Indeed, the fixtures for the beach were paid for and delivered but never installed.

31. Following the December debacle, Defendants continued to bill Mr. Siegal for their attempts to fix the lighting system. In addition to billing another $65,000 for "design and consultation" in 2007, Defendants hired outside experts to try and remedy the situation, billing Mr. Siegal at least $60,000 (plus travel) for this particular attempt to fix their errors.

32. According to Lutron representatives brought on-site for inspection, as of March 2007, the Lutron system still did not work – in part because it had been programmed in an "incompetent" manner. Moreover, because of Defendants' failure to install proper wiring and use appropriate routing and cabling practices, Lutron has refused to warranty the system.

33. One of the few fortunate aspects of this matter is that Mr. White recognizes that it is not Mr. Siegal's duty to pay Defendants for their remedial efforts. In March 2007, Mr. White wrote in an e-mail that Mr. Siegal should be reimbursed for amounts spent on two electrical experts. That logic extends to *all* attempts by Defendants to fix their own errors.

34. Since the "final" design was complete on January 24, 2006, Defendants have billed Mr. Siegal $386,000 for "design and consultation fees", of which Mr. Siegal has paid all but $111,000. Since the design was complete, Defendants have billed Mr. Siegal over $305,000 for "reimburseables", primarily for travel and outside consultants. Mr. Siegal has paid all but $90,000 of these fees. During the life of the project, Mr. Siegal has also been billed over $850,000 for fixtures, of which he has paid all but $43,000.

35. On information and belief, Defendants have excessively marked up the prices on these fixtures.

36. All told, Mr. Siegal has paid Defendants over $1.9 million, including fixtures, for a lighting system that does not work, and does not accommodate his wife's disability. In addition he has paid electrical subcontractors and other tradespeople hundreds of thousands of dollars to perform work that was (a) improper in the first place due to Defendants' design failures, and (b) improperly executed due to Defendants' failure to oversee the project properly. Finally, he has incurred and will incur unknown additional expense in order to put the system right.

<u>Defendants' Excuses</u>

37. During communications with Mr. Siegal, Defendants have occasionally alleged that the lighting system's failures were not their fault, but the result of shoddy installation. Even were this proven, it would not excuse Defendants.

38. Pursuant to Defendants' arrangement with Plaintiff, as acknowledged in writing by Mr. White, Defendants were to supervise installation of their lighting system in the Bahamas house. Mr. White held multiple-day meetings in the Bahamas to coordinate and oversee the efforts of electrical and lighting tradespeople. He and other White Lighting employees traveled

to the Bahamas to oversee installation of their vastly complex system. Mr. White designed all electrical blueprints to be used day to day on the job site. And, of course, Defendants billed Mr. Siegal for hundreds of thousands in fees and expenses *after* the lighting design was finalized. To the extent that installation errors were committed, it was Defendants' duty as supervisors to keep such errors from occurring, and Defendants cannot now disclaim responsibility for this fiasco.

### AS AND FOR A FIRST CAUSE OF ACTION
### AGAINST ALL DEFENDANTS (Breach of Contract)

39. Plaintiff repeats and realleges paragraphs 1 through 38 as if set forth fully herein.

40. In or about July 2003, Plaintiff and Defendants entered into an oral contract, pursuant to which Defendants were to design and supervise installation of a lighting system for Plaintiff's Bahamas home.

41. Pursuant to the contract, Defendants agreed to perform their duties in a workmanlike manner in accordance with directions given by Plaintiff and Mrs. Siegal.

42. Defendants were to be compensated for their design and oversight work, and were to be reimbursed for expenses, including fixtures and hardware.

43. Defendants' designs were materially flawed in numerous respects, detailed above, including without limitation faulty design of wiring, faulty balance of electrical loads, faulty design of custom fixtures, faulty placement of light switches, faulty design of lighting to accommodate Mrs. Siegal's vision impairment, and faulty programming of the computer-controlled lighting system.

44. In addition, Defendants failed properly to oversee installation of the lighting system, resulting in improper installation of wiring, hardware, and fixtures.