UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
RICHARD SIEGAL,

                      Plaintiff,    : 07 CV. 5991 (JSR)

      -against-

WHITE LIGHT DESIGN, INC. and KEVIN D. : **NOTICE OF MOTION**
WHITE,

                      Defendants.

------------------------------------X

    PLEASE TAKE NOTICE that, upon the Complaint, a true and correct copy of which is annexed hereto, the accompanying Memorandum of Law, and the Declaration of Kevin D. White, dated July 5, 2007, Defendants White Light Design, Inc. and Kevin D. White will move this Court before the Honorable Jed S. Rakoff, at the United States District Court, 500 Pearl Street, New York, New York 10007, on August 8, 2007 at 11:30 in the forenoon or as soon thereafter as counsel can be heard, for an Order pursuant to Federal Rule of Civil Procedure 12(b)(2) dismissing the Complaint on the grounds that the Court lacks personal jurisdiction over the Defendants or, in the alternative, transferring this action to a more convenient forum pursuant to 28 U.S.C. §1404.

    PLEASE TAKE FURTHER NOTICE that, Plaintiff's opposition is due on or before July 23, 2007, and that Defendants' reply is due on or before July 30, 2007.

Dated: July 9, 2007

VAL MANDEL, P.C.
80 Wall Street, Suite 1115
New York, NY 10005
*Attorneys for Defendants*

By: ______________________
Eric Wertheim (EW-3047)

SUPREME COURT OF NEW YORK
NEW YORK COUNTY
------------------------------------------------------X

RICHARD SIEGAL,

                Plaintiff,

    -against-

WHITE LIGHTING DESIGN, INC. and
KEVIN D. WHITE,

                Defendant.
------------------------------------------------------X

Index No. 07/601737

VERIFIED COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Richard Siegal ("Mr. Siegal" or "Plaintiff"), by and through his attorneys, Niehaus LLP, alleges as follows:

1. This action arises from the failure of Defendants to properly design and install an extremely expensive lighting system in Plaintiff's home. After more than four years of milking Mr. Siegal for over $1.9 million in fees and expenses, Defendants' lighting system still does not work, and Defendants are demanding another quarter-million dollars to continue their efforts to fix their own mistakes.

2. Plaintiff Richard Siegal is a citizen of the United States, and a New York resident. He maintains his place of business at 5 East 59th Street, New York, New York 10022.

3. Defendant Kevin D. White ("Mr. White") is a citizen of the United States, and a resident of the State of Colorado, with a principal place of business at 3775 Chase Street, Wheat Ridge, Colorado 80212. Mr. White is the principal and/or chief executive officer of Defendant White Lighting Design, Inc.

4. Defendant White Lighting Design, Inc. ("White Lighting") is a Colorado corporation, with a principal place of business at 3775 Chase Street, Wheat Ridge, Colorado 80212.

Planning and Agreement

5. In the summer of 2003 Plaintiff's wife, Mrs. Gail Siegal, approached Defendants about designing and supervising installation of lighting for a home that the Siegals were building in the Bahamas. Defendants had previously completed small lighting design and installation projects for the Siegals at their Vail, Colorado, and Long Island homes. In both cases, Defendants had spent considerable time designing the lighting projects, and then spent time on site, directly overseeing and supervising the projects.

6. Mr. Siegal hired Defendants to design and supervise installation of the lighting system for the Bahamas house for three primary reasons. First, Mr. Siegal and his wife wanted Defendants to design a lighting system that was aesthetically pleasing. Second, Mr. Siegal wanted all aspects of the lighting overseen and directed by a professional, from design of the system to supervision of the installation.

7. Third, Mr. Siegal wanted to ensure that the home's lighting would be appropriate for Mrs. Siegal. Mrs. Siegal suffers from the effects of low tension glaucoma, which severely restricts her field of vision. Mrs. Siegal finds it difficult to see, and very difficult to read under normal lighting – her condition requires significant "overlighting" and the elimination of shadows or dim spots in a room. Defendants were therefore hired to design and oversee installation of a lighting system that would accommodate Mrs. Siegal's vision disability.

8. Sensing an opportunity for a huge fee, Mr. White began pushing the Siegals to install a highly complicated, very expensive Lutron lighting system for the Bahamas house. Mr.

White promised that the Lutron system would consist of a house- and grounds-wide lighting and electrical control system, centrally controlled by computer.

9.  Mrs. Siegal expressed doubts that such a complicated system was necessary, stating that she preferred a simpler lighting system that would meet her special needs. But Mr. White continued to push the complex, computer-controlled Lutron system, claiming that it would provide the best lighting for Mrs. Siegal's condition.

10. The design, installation, and programming of such a system was far more ambitious than any work Mr. White had previously performed for Plaintiff, but Mr. White assured Mrs. Siegal that he was up to the challenge.

11. In or about July 2004, the parties therefore agreed that Mr. White and White Lighting would design and oversee the installation of all lighting the Siegal's Bahamas home. As part of the process, Defendants would also design and program the computer-controlled Lutron system. This agreement was confirmed in correspondence between the parties.

12. During discussions over the course of 2004-05, Mrs. Siegal continually reaffirmed that the Lutron system was to be kept simple, with the computer responsible for such basic functions as turning on outdoor lighting as specified times, and turning on lights while the Siegals were away from their home. Mrs. Siegal and Mr. White also repeatedly discussed Mrs. Siegal's deteriorating eyesight, which by 2006 had reduced her vision to approximately 10% in one eye, and 60% in the other.

13. Construction on the Bahamas house commenced in early 2004. During the early phases of construction, Mr. White and White Lighting employees attended meetings in the Bahamas to discuss construction-related issues. Mr. Siegal paid for these trips, for luxury hotel accommodations for Mr. White and his staff, and for Mr. White's time during these trips.

14. On January 24, 2006, Defendants submitted their "final" design for the home's lighting system. To that point, Defendants had charged Mr. Siegal over *$470,000* in "design and consultation fees." Defendants had further charged Mr. Siegal over $110,000 in "reimburseables," primarily travel time and travel expenses for Mr. White's trips to the Bahamas to coordinate design and oversee initial construction. In sum, Mr. Siegal had paid almost $600,000 simply for Defendants to design the "perfect" lighting system.

15. Aside from a few minor open items, Mr. White represented that the January 2006 design was complete, and all that remained was to execute it.

16. However, when installation of the lighting system began, it quickly became obvious that Defendants' design was massively flawed.

Wiring and Lutron System Design Flaws

17. As Lutron itself later determined, one of the most significant – and dangerous -- flaws involved the design's failure to specify proper wiring for the lighting system. Not only did Defendants' design fail to specify properly the appropriate communication wire, it failed to ensure proper cable routing and termination, greatly increasing the chances of interference and breakdowns. Defendants' design also improperly balanced the electrical loads on the system, resulting in outages, short circuits, and lights that simply would not turn on. Electricians on the job claimed that they were afraid to turn on the lights for fear that the electrical system would explode.

18. Despite Defendants' promise that their system design complied with a variety of electrical codes, numerous aspects of the system presented blatant code violations, including:

   a. bundling line voltage wiring and low-voltage wiring;
   b. failing to ground numerous wires; and

    c. crossing wires, resulting in electrical shorts.

19. Mr. White's ignorance of the crucial issue of proper wiring – a purported expertise for which Mr. Siegal had paid hundreds of thousands of dollars – is well-illustrated by an e-mail Mr. White sent to a Lutron representative. In that e-mail, the Lutron representative asks Mr. White how much "2 conductor low voltage (class 2) wire" they would need for specific fixtures. Mr. White failed to recognize that the identified wire could not be used for these fixtures, which required a completely different type of wire. He then wrote the Lutron representative, "My assumption is that your guess is going to be far more accurate than mine. How's that for avoiding any responsibility?"

20. The wiring design issues revealed themselves in spectacular fashion in late 2006. When the Lutron system was turned on for the first time, it immediately shorted out, damaging a number of system components that had to be replaced.

<u>Additional Design Flaws</u>

21. Significant design flaws also vitiated a major purpose of hiring a professional lighting designer – to ensure that Mrs. Siegal could see in her own home. Specifically:

    a. In a dark hallway almost one hundred yards long, Defendants designed and installed tiny recessed lights. Mrs. Siegal cannot see sufficiently in this hallway to navigate it by herself.

    b. Similarly, the lighting in the media room is so low that neither Mr. Siegal nor Mrs. Siegal can read in the room, and there is no way to sufficiently brighten the lights

22. Defendants committed other unprofessional and negligent design errors or omissions that belied their purported expertise:

   a. Certain lighting fixtures cannot be operated manually, but are solely controlled by computer, meaning that a software engineer is required in order to make any adjustments to the lights.
   b. Defendants' design had hidden the light switch for an indoor-outdoor terrace thirty feet away inside a dark laundry room.
   c. The ceiling fans that Defendants had designed and installed on the indoor/outdoor terrace were insufficient to move the air in the room, requiring entirely new units to be purchased and installed.
   d. Insufficient lighting was installed for the tennis courts, leaving them unplayable in the evening or at night.
   e. Eleven custom-designed and built light-diffusing fixtures, costing over $325,000, began shedding glass panels shortly after installation. The falling panels not only ruined the appearance of the fixtures, but posed a grave danger to anyone standing beneath them. Unwilling to redesign and reinstall the fixtures, Defendants instead re-tied glass panels to the frames using transparent fishing line.

<u>Defendants' Attempted Fixes</u>

   23. When it became apparent that Defendants' designs were severely flawed, Mr. Siegal demanded that the problems be addressed. Defendants proved just as incapable of fixing their mess as they had been in the initial task of design and supervision.

   24. Throughout the summer and fall of 2006, Defendants traveled to the Bahamas in an attempt to get their lighting system to operate properly. In each case, they were unsuccessful. Lights were not operable from different rooms, computer-controlled window shades did not

function, lights did not turn on automatically at their assigned time, and the system remained in continual danger of crashing or shorting out due to the faulty wiring.

25. Throughout this period, Defendants continued to bill Mr. Siegal for work that amounted to simply trying to fix their own mistakes. As Defendants continued to fail, their bills continued to mount. "Design and consultation fees" alone were billed at $17,000 for May, $21,000 for June, $30,000 for July, $17,000 for August, $23,000 for September, $37,000 for October, and $43,000 for November. Similarly, Defendants traveled to the Bahamas – at Mr. Siegal's expense – to try and rectify the lighting system's flaws. Nothing worked.

26. On one occasion, White Lighting employee Elizabeth Gillmor was flown to the Bahamas at Plaintiff's expense for the express purpose of re-programming the system. Instead, she succeeded in crashing the entire system, and left it inoperable.

27. In November and early December 2006, Defendants made a "final push" to get the home ready for the holidays. The entire Siegal family, including a number of small grandchildren, was coming to the Bahamas for the holidays. Mr. White brought a team of employees, as well as an outside electrical engineer, to the Bahamas in yet another attempt to fix Defendants' mistakes.

28. In mid-December 2006, Mr. White declared the lighting complete. He claimed that all of the lights worked perfectly, the Lutron computer-control system was fully operational, and the home was in move-in condition. Once again, he was wrong.

29. On December 14, 2006 an independent electrical engineer ran the Lutron diagnostic test on the Lutron system that Mr. White had declared fully operational. The diagnostic test revealed 116 "serious" errors in the system. Entire rooms had no operational lights. Individual lights and switches did not work. Dimmers did not function. Certain lights

were not tied to the Lutron system at all. Other switches controlled multiple lights. The complex system that Mr. White had foisted on the Siegals despite their reluctance simply did not work.

30. But Defendants' failures were not limited to the Lutron system. Despite Mr. White's assurances that the lighting was "complete," and the house in "move-in condition," a review of the premises revealed numerous lighting and electrical flaws. In at least a dozen places, bare and live wires were left exposed. A number of electrical outlets and light switches were missing. Cover plates had not been installed. In three different locations, uncovered and ungrounded wire protruded from junction boxes. And there was no operational lighting at all for the tennis courts or the beach. Indeed, the fixtures for the beach were paid for and delivered but never installed.

31. Following the December debacle, Defendants continued to bill Mr. Siegal for their attempts to fix the lighting system. In addition to billing another $65,000 for "design and consultation" in 2007, Defendants hired outside experts to try and remedy the situation, billing Mr. Siegal at least $60,000 (plus travel) for this particular attempt to fix their errors.

32. According to Lutron representatives brought on-site for inspection, as of March 2007, the Lutron system still did not work – in part because it had been programmed in an "incompetent" manner. Moreover, because of Defendants' failure to install proper wiring and use appropriate routing and cabling practices, Lutron has refused to warranty the system.

33. One of the few fortunate aspects of this matter is that Mr. White recognizes that it is not Mr. Siegal's duty to pay Defendants for their remedial efforts. In March 2007, Mr. White wrote in an e-mail that Mr. Siegal should be reimbursed for amounts spent on two electrical experts. That logic extends to *all* attempts by Defendants to fix their own errors.

34. Since the "final" design was complete on January 24, 2006, Defendants have billed Mr. Siegal $386,000 for "design and consultation fees", of which Mr. Siegal has paid all but $111,000. Since the design was complete, Defendants have billed Mr. Siegal over $305,000 for "reimburseables", primarily for travel and outside consultants. Mr. Siegal has paid all but $90,000 of these fees. During the life of the project, Mr. Siegal has also been billed over $850,000 for fixtures, of which he has paid all but $43,000.

35. On information and belief, Defendants have excessively marked up the prices on these fixtures.

36. All told, Mr. Siegal has paid Defendants over $1.9 million, including fixtures, for a lighting system that does not work, and does not accommodate his wife's disability. In addition he has paid electrical subcontractors and other tradespeople hundreds of thousands of dollars to perform work that was (a) improper in the first place due to Defendants' design failures, and (b) improperly executed due to Defendants' failure to oversee the project properly. Finally, he has incurred and will incur unknown additional expense in order to put the system right.

Defendants' Excuses

37. During communications with Mr. Siegal, Defendants have occasionally alleged that the lighting system's failures were not their fault, but the result of shoddy installation. Even were this proven, it would not excuse Defendants.

38. Pursuant to Defendants' arrangement with Plaintiff, as acknowledged in writing by Mr. White, Defendants were to supervise installation of their lighting system in the Bahamas house. Mr. White held multiple-day meetings in the Bahamas to coordinate and oversee the efforts of electrical and lighting tradespeople. He and other White Lighting employees traveled

to the Bahamas to oversee installation of their vastly complex system. Mr. White designed all electrical blueprints to be used day to day on the job site. And, of course, Defendants billed Mr. Siegal for hundreds of thousands in fees and expenses *after* the lighting design was finalized. To the extent that installation errors were committed, it was Defendants' duty as supervisors to keep such errors from occurring, and Defendants cannot now disclaim responsibility for this fiasco.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS (Breach of Contract)

39. Plaintiff repeats and realleges paragraphs 1 through 38 as if set forth fully herein.

40. In or about July 2003, Plaintiff and Defendants entered into an oral contract, pursuant to which Defendants were to design and supervise installation of a lighting system for Plaintiff's Bahamas home.

41. Pursuant to the contract, Defendants agreed to perform their duties in a workmanlike manner in accordance with directions given by Plaintiff and Mrs. Siegal.

42. Defendants were to be compensated for their design and oversight work, and were to be reimbursed for expenses, including fixtures and hardware.

43. Defendants' designs were materially flawed in numerous respects, detailed above, including without limitation faulty design of wiring, faulty balance of electrical loads, faulty design of custom fixtures, faulty placement of light switches, faulty design of lighting to accommodate Mrs. Siegal's vision impairment, and faulty programming of the computer-controlled lighting system.

44. In addition, Defendants failed properly to oversee installation of the lighting system, resulting in improper installation of wiring, hardware, and fixtures.

45. On information and belief, Defendants charged Plaintiff an excessive mark-up on fixtures and other hardware.

46. Each of these breaches also violated the covenant of good faith and fair dealing.

47. Plaintiff has paid Defendants over $1.9 million for their faulty work.

48. Plaintiff has paid electrical contractors and other contractors approximately $1 million for work performed pursuant to Defendants' design, and under Defendants' supervision.

49. Plaintiff has paid or will pay outside parties hundreds of thousands of dollars to try and bring the lighting system to his original specifications.

50. Plaintiff paid for a Lutron control system that does not work properly and that the manufacturer will not warranty as a result of Defendants' failures.

51. As a result of the defective design and failure properly to supervise the installation, Plaintiff has failed to receive the benefit of the bargain -- a properly-designed, fully functional lighting system with full warranty

52. As a result of the defective design and failure properly to supervise the installation, Plaintiff has been forced to expend vast sums in attempts to remedy Defendants' defects and omissions, and to furnish work, labor, services, and materials necessary to complete the installation of the lighting system in accordance with the plan and directives. Such attempts are ongoing, and the lighting system is still not fully operational.

53. As a result of excessive mark-ups Plaintiff has been damaged in an amount to be determined at trial.

54. As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial, but in excess of $1,500,000.00, plus interest.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST ALL DEFENDANTS (Unjust enrichment)

55. Plaintiff repeats and realleges paragraphs 1 through 54 as if set forth fully herein.

56. In the alternative, a quasi-contract existed between the parties, and Defendants have been unjustly enriched by Plaintiff in that Plaintiff has paid for designs that were faulty, has paid for work not performed in a professional manner, has paid for fixtures that did not work, has paid for fixtures that were improperly designed, has paid for damage caused by Defendants' own negligence, has paid excessive markups for fixtures, and has paid for attempts by Defendants to fix their own mistakes.

57. Based on Defendants' representations regarding their professional skill, Plaintiff reasonably expected that the designs would be appropriate, that work would be performed in a professional manner, that fixtures would work, that fixtures would be appropriate, that fixtures would be priced reasonably, that Defendants would not be negligent, and that Plaintiff would not have to pay Defendants to remedy their own mistakes.

58. As a result of Plaintiff's payments to Defendants, Defendants have been unjustly enriched in an amount to be determined at trial, but in excess of $1,000,000.00. In equity and good conscience, Defendants should be required to return such funds, plus interest.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST ALL DEFENDANTS (Breach of Implied Warranty)

59. Plaintiff repeats and realleges paragraphs 1 through 58 as if set forth fully herein.

60. As detailed above, the lighting system designed and installed by Defendants was materially flawed in numerous respects, including without limitation faulty design of wiring, faulty balance of electrical loads, faulty design of custom fixtures, faulty placement of light

switches, faulty design of lighting to accommodate Mrs. Siegal's vision impairment, and faulty programming of the computer-controlled lighting system.

61. As a result of these design or installation flaws, Plaintiffs did not receive a lighting system that functioned in the promised manner, and indeed did not receive any operative lighting in various parts of the house and grounds. The lighting system is not fit for ordinary purpose for which it is to be used.

62. These defects existed upon installation of the lighting system, and many continue to this day.

63. As a result of the defective design and failure properly to supervise the installation, Plaintiff has been forced to expend vast sums in attempts to remedy Defendants' defects and omissions, and to furnish work, labor, services, and materials necessary to complete the installation of the lighting system in accordance with the plan and directives. Such attempts are ongoing, and the lighting system is still not fully operational.

64. As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial, but in excess of $1,500,000.00, plus interest.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS (Negligent Design)

65. Plaintiff repeats and realleges paragraphs 1 through 64 as if set forth fully herein.

66. At all times Defendants held themselves out as qualified to design the lighting system in Plaintiff's Bahamas house.

67. At all relevant times, Plaintiff relied exclusively upon the Defendants' expertise in designing the installation of the lighting system.

68. Defendants owed Plaintiff a duty to perform their professional duties in a workmanlike manner.

69. By the conduct detailed above, Defendants negligently breached their duties to Plaintiff, in that Defendants' designs were materially flawed in numerous respects, including without limitation faulty design of wiring, faulty balance of electrical loads, faulty design of custom fixtures, faulty placement of light switches, faulty design of lighting to accommodate Mrs. Siegal's vision impairment, and faulty programming of the computer-controlled lighting system.

70. As a result of Defendants' negligence, Plaintiff has been injured in the manner set forth above, in that Plaintiff has failed to receive a properly-designed, fully functional lighting system, and in that Plaintiff has been forced to expend vast sums in attempts to remedy Defendants' defects and omissions, and to furnish work, labor, services, and materials necessary to complete the installation of the lighting system in accordance with the plan and directives. As a result of Defendants' negligence, Plaintiff has been damaged in an amount to be proven at trial, but in excess of $1,500,000.00, plus interest.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS (Negligent Supervision)

71. Plaintiff repeats and realleges paragraphs 1 through 70 as if set forth fully herein.

72. At all times Defendants held themselves out as qualified to supervise and oversee the installation of their lighting system in Plaintiff's Bahamas house.

73. At all relevant times, Plaintiff relied exclusively upon the Defendants' expertise in supervising and overseeing the installation of the lighting system.

74. Defendants owed Plaintiff a duty to perform their professional duties in a workmanlike manner.

75. By the conduct detailed above, Defendants negligently breached their duties to Plaintiff, in that Defendants failed to adequately supervise the installation of the lighting system in Plaintiff's home.

76. As a result of Defendants' negligence, Plaintiff has been injured in the manner set forth above, in that Plaintiff has failed to receive a properly-designed, fully functional lighting system, and in that Plaintiff has been forced to expend vast sums in attempts to remedy Defendants' defects and omissions, and to furnish work, labor, services, and materials necessary to complete the installation of the lighting system in accordance with the plan and directives.

77. As a result of Defendants' negligence, Plaintiff has been damaged in an amount to be proven at trial, but in excess of $1,500,000.00, plus interest.

### AS AND FOR A SIXTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS (Declaratory Judgment)

78. Plaintiff repeats and realleges paragraphs 1 through 77 as if set forth fully herein.

79. On or about May 11, 2007, Plaintiff received a letter from a law firm representing Defendants. The letter demanded a payment of $251,833.91, representing "design and consultation fees" of $111,470, "reimburseables" of $90,373.73, fixture costs of $43,532.59, and tax of $6,457.60.

80. Because the vast majority of these fees represent work done in an attempt to remedy Defendants' own failures, Plaintiff has declined to further enrich Mr. White.

81. As a result of Defendants' demand for payment, and Mr. Siegal's refusal, a bona fide controversy exists between the parties.

82. The allegations detailed above, if proven, will entitle Mr. Siegal to a declaratory judgment that Defendants are not entitled to further payment from Mr. Siegal.

83. Mr. Siegal therefore requests entry of a declaratory judgment that he does not owe Defendants any further funds for work performed by Defendants or their agents on the Bahamas house.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all causes of action.

WHEREFORE, Plaintiff respectfully demands judgment, on trial by jury, as follows:

1. Against Defendant, on the First through Fifth Causes of Action, for compensatory and consequential damages, including efforts at remediation, according to proof and sufficient to provide him the benefit of his bargain, but in excess of $1,500,000.00.

2. Against Defendant, on the Sixth Cause of Action, for a judgment declaring that Plaintiff does not owe Defendants any further funds for work performed by Defendants or their agents on the Bahamas house.

3. For costs of the suit herein.

4. For pre-judgment interest at the legal rate.

5. For such other and further relief as the Court may deem just and proper.

Dated: May 23, 2007
New York, New York

NIEHAUS LLP

_____
Paul R. Niehaus
NIEHAUS LLP
230 Park Avenue, 10th Floor
New York, New York  10169
Tel. (212) 551-1445
Fax (212) 624-0223

*Attorneys for Plaintiff*

## VERIFICATION

STATE OF NEW YORK   )
                    ) ss.
COUNTY OF NEW YORK  )

I, Mr. Richard Siegal, being duly sworn, state:

I am the named Plaintiff to this action. The foregoing complaint is true to my own knowledge, except as to matters therein stated to be alleged on information and belief, and as to those matters I believe it to be true.

_____
Richard Siegal

Sworn to me this 15th day of May, 2007

_____
Notary Public

MARIA J. SCIBELLI
Notary Public, State of New York
No. 41-4626950
Qualified in Queens County
Commission Expires March 30, 2010