UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                 :

RICHARD SIEGAL,                        :       No. 07-cv-5991 (JSR)
                                                 :       Electronically Filed Case
                Plaintiff,      :
                                                 :       **AFFIDAVIT OF GAIL**
         -against-             :       **SIEGAL IN OPPOSITION TO**
                                                 :       **DEFENDANT'S MOTION TO**
WHITE LIGHTING DESIGN, INC. and    :       **DISMISS OR TRANSFER**
KEVIN D. WHITE,                    :
                                               :
                Defendants.   :
------------------------------------------------------------------X

STATE OF NEW YORK    }
                                  } ss.
COUNTY OF NEW YORK  }

GAIL SIEGAL, being duly sworn, hereby deposes and says:

       1.       I am married to Richard Siegal, plaintiff in this action, and I make this affidavit in opposition to Defendants' motion to dismiss the Complaint for lack of personal jurisdiction, or to transfer this case to the District Court of Colorado.  Unless otherwise stated, I make this affidavit of my own personal knowledge.

       2.       Mr. White and/or his employee traveled to our New York home at least a half dozen times in connection with his work on the lighting for the Bahamas house.  During each of these trips, I would meet with Mr. White and his employee for hours at a time to discuss the lighting for the Bahamas house.  While I cannot recall the attendees of any particular trip, Mr. White often traveled to New York with his employee Elizabeth Gilmore, and she attended a number of meetings in New York with Mr. White.

       3.       Serious work was accomplished during these meetings in New York, and our conversations were both high-level and specific.  We discussed and reviewed the general design of the lighting system, lighting for specific rooms, specific types of lighting, specific fixtures, my

special lighting needs given my ocular condition, time frames for the completion of work, progress that had been made. I also specifically recall discussing the cost of hand-blown glass fixtures to be installed in the second floor hallway.

4. These New York meetings were integral to the performance of Mr. White's duties as our lighting designer, as significant decisions were discussed and made at the meetings. A typical meeting in New York would consist of Mr. White or his employees showing me a variety of design and fixture sketches, plans and photos, discussing the options and placement of fixtures, and my either selecting a particular design or fixture, or requesting that Mr. White suggest additional alternatives. I specifically recall selecting certain lamps and fixtures during one of the New York meetings. While other decisions were made on the basis of fax and phone correspondence, it would have been very difficult for the project to proceed without the in-person New York meetings.

5. I also had extensive fax and phone contact with Mr. White and his employees, including Ms. Gilmore, from New York.

6. Throughout the four-year course of the project, I spoke with Mr. White and his employees by phone, from New York, dozens of times. The calls ranged from 30 minutes in duration to 90 minutes or more. During the early phases of the project, including design and initial construction, I spoke to Mr. White and his employees (usually Elizabeth Gilmore) on a weekly or semi-weekly basis. Subsequently, the frequency of the calls would vary depending on activity at the work site.

7. The subjects of the phone conversations were very similar to the topics discussed during our meetings in New York, and generally covered the gamut of design choices and decisions. Occasionally, I would be joined on the calls by employees of BHR Design, including Barbara Ross or Lauder Bowdin.

8. On a regular basis, I also received dozens of faxes from Mr. White and his employees at my New York home. Again, these faxes generally covered a wide range of design and fixture options, including sketches, photos, and plans for the lighting system. Frequently, phone conversations and faxes were used in tandem to make design and fixture decisions. Mr. White or his employees would fax me a variety of options, and during our next call we would discuss them and possibly make a decision. Based on the phone conversation, Mr. White or his employees would prepare the next fax, and the process would repeat.

9. On a few occasions, Mr. White sent Federal Express packages to New York in connection with this matter. I recall that these packages generally contained higher-quality versions of plans, sketches, and photos than could be transmitted by fax.

10. Although it is difficult to estimate the volume of faxes and hard copy correspondence I received in New York from Mr. White or his employees, I certainly received hundreds of pages. And while I have not kept all correspondence received from Mr. White relating to this matter, my file currently consists of approximately two and a half inches of paper.

11. No formal contract was ever signed regarding the design and installation of the lighting system.

12. Every invoice sent by Defendants regarding the Bahamas house was sent to New York.

13. Every payment made to Defendants regarding the Bahamas house was sent from New York.

14. Tim Smith, an electrical engineer and potential witness in this matter, is located in New York. Mr. Smith has reviewed the Bahamas house lighting system extensively, and may testify as to the quality of Defendants' design and the quality of the installation of the lighting system.

15. Barbara Ross and Lauder Bowdin, designers who participated in some of the New York phone calls with Mr. White, and potential witnesses in this matter, are located in New York. Ms. Ross and Ms. Bowdin may testify regarding my design choices, my input into the design process, and Mr. White and his employee's statements during the phone conversations.

16. Andrew Wakefield, a Director in Lutron's Home Systems Business Unit and potential witness in this matter, is, on information and belief, located in Pennsylvania. Mr. Wakefield may be called to testify regarding the faulty design and installation of the lighting system. Additional Lutron representatives who personally performed the on-site inspections for Lutron are also believed to be located in Pennsylvania.

17. Employees of Carpenter Electric, who traveled to the Bahamas house to assess the lighting system and attempt to fix Defendants' errors, are located in Pennsylvania. Those persons may be called to testify regarding the faulty design and installation of the lighting system.

18. Although it is impossible to say at this stage of the litigation what other witnesses might be called to testify, all of the people who worked on the lighting system in the Bahamas house are potential witnesses, and all are located either in Florida or the Bahamas.

19. I have never visited Mr. White's Colorado offices, and have never met with Mr. White or his employees in his Colorado offices.

20. My husband and I own a condominium in Vail, Colorado. From that condominium to downtown Denver is approximately 100 miles, and two hours' driving time. In 2004 Mr. Siegal underwent open-heart surgery, and during the two years after that surgery, we visited the Vail condominium only once or twice.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Gail Siegal

Sworn before me this 27 day of July, 2007
at New York, New York.

_____
Notary Public

MARIA J. SCIBELLI
Notary Public, State of New York
No. 41-4625050
Qualified in Queens County
Commission Expires March 30, 2010